E-FILED
Monday, 05 November, 2018  04:11:03 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAN KAY GAYLORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3196 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jan Kay Gaylord appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Gaylord filed a Motion for Summary Judgment (d/e 10).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15). This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be REVERSED and REMANDED.

## STATEMENT OF FACTS

Gaylord was born on September 28, 1962. She went to school into the 10th grade, but did not pass that grade. She previously worked as a cashier, food service manager, order picker, and mental retardation aide. Gaylord last worked on February 15, 2013. Gaylord alleged that she became disabled on that date. Gaylord suffered from major dysfunction of her left shoulder; degenerative disc disease of the lumbar and thoracic spine; affective disorder; major depressive disorder; and borderline personality disorder. Certified Transcript of Proceedings before the Social Security Administration (d/e 7) (R.) 18, 34, 51-52, 202, 367, 368.

On September 4, 2012, Gaylord went to the emergency room at Illini Community Hospital in Pittsfield, Illinois, for back pain. R. 515-16. Gaylord said she recently fell out of bed. She had chronic back problems that had been inactive before the fall. She said she had pain in her back and legs with occasional numbness. R. 515. On examination, Gaylord was in acute distress and pain. She had tenderness over the right buttock and lower lumbar spine. She had pain with any movement of her legs. She had normal strength throughout and no sensory loss. X-rays showed no acute fractures. R. 515. The emergency room physicians gave her dilaudid and phenergan. She improved significantly and was discharged. R. 516.

On January 26, 2013, Gaylord returned to the Illini Community Hospital emergency room with pain and swelling in the left lateral aspect of the anal verge.  The pain and swelling began after Gaylord lifted heavy objects at work.  On examination, the area was extremely tender to palpation.  Gaylord had full range of motion in all extremities with no evidence of neurological deficits.  She was treated with naproxen and other conservative measures. She was off work until February 10, 2013.  R. 518.

On February 12, 2013, Gaylord went to Illini Community Hospital for depression.  She said that she became more depressed in the prior two weeks.  She told her daughter and boyfriend that she was "just going to take all of her pills."  She said that she was sleeping too much and was hopeless.  She was tearful.  There was no suggestion of hallucinations. She was diagnosed with major depression with suicidal ideation.  She was transferred to Blessing Hospital in Quincy, Illinois, for inpatient psychiatric treatment.  R. 498.

Gaylord was admitted at Blessing Hospital on February 12, 2013, with acute depression. She stated that she became acutely depressed because her employer cut her hours.  She worked at a convenience store. Her mood was a combination of anxiety and dysphoria.  She reported no suicidal thoughts at the time of admission.  She was diagnosed at

admission with major depression, recurrent, nonpsychotic, moderate; cannabis habituation; with a Global Assessment of Functioning (GAF) score of 40.  A GAF score is an assessment of the overall level of functioning of an individual.  A GAF score of 31 to 40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR), at 34. The American Psychiatric Association no longer recommends the use of GAF scores.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

Gaylord was placed in the affective track of the Behavioral Medicine program at the hospital.  R. 500-01.  Gaylord was discharged on February 13, 2013.  She responded to psychotropic medication.  She agreed to resume treatment through Illini Community Hospital and to take her medication as prescribed.  On discharge, she was assigned a GAF score of 50.  R. 503.  A GAF score of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  (DSM-IV-TR), at 34.

On April 30, 2013, Gaylord was transferred from Illini Community Hospital to Blessing Hospital for status post overdose of Xanax and depression.  Gaylord intentionally took five Xanax, 20 flexeril, and 20 over-the-counter female enhancers.  She said her fiancé became emotionally and verbally abusive when he was intoxicated with alcohol.  R. 496.  On admission, Gaylord was also positive for cocaine, amphetamines, and opiates.  R. 494.  Gaylord reported being stalked by one of her boyfriend's other girlfriends.  Gaylord "endorses anxiety, dysphoria, and dysthymia." R. 494.   On admission, she was diagnosed with major depressive disorder, severe, recurrent, without psychotic features; cocaine, amphetamine and narcotic abuse, and also benzodiazepine abuse; borderline personality disorder traits.  R. 496. She was assigned a GAF score of 30.  R. 495.  A GAF score of 21 to 30 indicates behavior that is influenced considerably by delusions or hallucinations; serious impairment in communication or judgment; or inability to function in almost all areas.  (DSM-IV-TR), at 34.

During inpatient therapy sessions at Blessing Hospital, Gaylord "endorses feeling of hopelessness, helplessness, worthlessness, difficulties concentrating, anhedonia, passive death wishes, and suicidal ideations secondary to difficult relationship with her boyfriend."  R. 496.

Gaylord was discharged on May 6, 2013.  Gaylord's benzodiazepine medications were discontinued.[1]  She was prescribed Zoloft, propranolol and estradiol.  At discharge, Gaylord was "hopeful and positive about the future and denies suicidal or homicidal ideas, plans, or intentions." Her discharge diagnosis was major depressive disorder, severe, recurrent, without psychotic features; alcohol abuse, cocaine, amphetamine, opiate, and benzodiazepine abuse; and borderline personality disorder.  She was assigned a GAF score of greater than 50.  R. 496.  A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34.

On June 26, 2013, Gaylord went to Illini Community Hospital with abdominal pain.  An x-ray showed no obstructions or free air.  A CT scan showed no evidence of kidney stones or hydronephrosis, but showed diverticulosis without evidence of diverticulitis and could not exclude colitis. R. 637-38.  On August 15, 2013, an endoscopy showed normal results.  R. 520.  A colonoscopy on the same date showed polyps, diverticulosis, and internal hemorrhoids.  Gaylord was told to eat a fiber rich diet.  R. 522.

---

[1] Xanax (alprazolam) is a benzodiazepine class medication.  See www.pdr.net/drug-summary/Xana-alpraxzolam-1873.31, viewed August 28, 2018.

On September 23, 2013, Gaylord completed a Disability Report—Adult form.  R. 366-74.  Gaylord stated that she suffered from depression, anxiety, panic attacks, insomnia, and tendonitis.  R. 367.  Gaylord said she stopped working because of her impairments.  Gaylord stated, "I am always very depressed and have severely high anxiety.  I have sporadic panic attacks which makes me nervous about leaving my home.  I have constant hand tremors which limits my ability to left (sic) and grasp objects."  R. 372.

On October 11, 2013, Gaylord had x-rays taken of her thoracic and lumbar spine.  The lumbar x-rays showed mild multilevel lumbar spondylosis, mild arthritis, and atherosclerotic vascular disease.  R. 639.  The thoracic spine x-rays showed multilevel spondylosis from mid to lower thoracic spine.  R. 639-40.

On October 22, 2013, Gaylord completed a Function Report—Adult form.  R. 378-85.  Gaylord said she lived in a house with friends.  She said anxiety, hand tremors, major depression, and arthritis of her spine, hips, knees, and hands limited her ability to work.  R. 378.  Gaylord said that during the typical day she watched television and cleaned house.  Gaylord said she could not sleep because her mind raced and her back hurt.  Gaylord said she could feed herself and use a toilet.  She said she did not otherwise bathe, take care of her personal hygiene, or dress because she

did not care to and no one would see her.  R. 379.  She sometimes needed reminders to take her medicine.  R. 380.

Gaylord prepared her own meals, washed clothes, and cleaned house.  She prepared meals weekly and she washed clothes and cleaned house once every three to four weeks.  She sometimes needed encouragement to do these things.  R. 380.

Gaylord went outside one to three times a week.  She walked and drove.  She sometimes went alone.  She shopped for groceries once a month.  She paid her bills.  She engaged in crochet and sewing one to two times a week, but "sometimes not at all."  She rarely had her grandchildren stay with her.  She went to football games for the entire season.  She went twice a month.  She did not need anyone to accompany her.  R. 382.  She said she had problems with family and friends because "sometimes they treat me bad."  R. 383.  Gaylord opined that she could lift five to 10 pounds, walk a block before needing to rest for 10 to 15 minutes; and pay attention for three to five minutes.  She stated that she did not finish what she started, she could follow written instructions but not spoken instructions, and she got along with authority figures "most of the time."  She did not handle stress or changes in routine well.  R. 383-84.  She said she was afraid of being in a place with too many strange people.  R. 384.

On January 20, 2014, consultative physician Dr. Joseph J. Kozma, M.D., conducted a consultative physical examination of Gaylord.  R. 551-58.  Gaylord told Dr. Kozma that she had pain in her feet and back when she worked as a cashier.  She said the pain had gotten worse lately.  Gaylord also said she had pain in her left shoulder.  Gaylord said she could walk a block without difficulty.  R. 552.  Gaylord said she did not drink, she smoked a third of a pack of cigarettes a day, and she used to use marijuana.  She said she stopped a month before the examination.  R. 553.

On examination, Gaylord was 64 ¼ inches tall and weighed 158 pounds.  Gaylord had no tenderness in her cervical spine, minimal tenderness in her thoracic spine, mild tenderness in her lower spine, and normal muscle tone in the paravertebral muscles.  Gaylord had normal strength and range of motion in her extremities, normal grip strength, and normal finger dexterity.  Gaylord had mild tenderness in her lower back.  Gaylord could heel and toe walk, and squat.  She had normal range of motion in her lumbar spine, normal gait normal posture.   R. 553-55.

Dr. Kozma concluded, in part:

**DISCUSSION:** Ms. Gaylord is a right handed individual who has no difficulty using her hands and fingers for gross and fine manipulations.  Her grip strength is good, so is her finger dexterity.  She does not use crutches, canes or other assisting devices.  She is able to walk a block without difficulty but she is not able to be on her feet much more than five (5) or ten (10)

minutes because she has discomfort in her legs. That is the reason she stopped working .as a cashier.

She is also complaining of some shoulder pain on the left.  This is not an important factor for her.

. . . .

Her medications are directed to her psychological problem, as well as for pain problem.  She is quite well stable with her medications.

R.  556.

On January 24, 2014, consultative psychologist Fred Stelling, M.A., LCP, conducted a psychological consultation and mental status examination.  R. 545-49.  Stelling found that Gaylord had problems with her immediate and short-term memory as well as her ability to concentrate. Stelling stated the memory problems could be related to a history of substance abuse.  Gaylord stated that she used "to do coke, crack, meth, marijuana; drink like a fish."  R. 547.  Gaylord said she did not do that anymore.  She said she quit marijuana a month earlier, stopped drinking a year earlier, and stopped using cocaine nine years ago.  R. 547-48. Stelling found that Gaylord's depression symptoms included insomnia, reduced appetite, lack of energy, depressed mood, depreciating self-concept, bimonthly suicidal thoughts, and auditory hallucinations with psychotic features.  Stelling found Gaylord's anxiety symptoms included

disturbed sleep and anxiety attacks when in crowds.  Stelling found that

Gaylord suffered from panic disorder without agoraphobia.  R. 548.

Stelling diagnosed Gaylord with major depressive disorder recurrent,

severe with psychotic features; and panic disorder without agoraphobia.

Stelling assigned a Global Assessment of Functioning (GAF) score of 45.

R. 548-49.  Stelling opined that Gaylord had the following vocational

issues:

> Jan's concerns in immediate memory/attention and short term
> memory could indicate a marked decrease in ability to
> follow/remember verbal instructions/directions.
>
> Her concentration issue could suggest a moderate to marked
> reduction in ability to complete tasks that require a concerted
> focus.
>
> Jan's lack of energy and decreased interests could project an
> unmotivated person, who would have at least moderate
> difficulty sustaining a productive pace.
>
> Jan's depreciating self-concept could indicate a marked lack of
> confidence in abilities.
>
> Her anxiety episodes in crowds would suggest vocational
> settings with few employees/customers.

R. 549 (reference to specific examination test results omitted).

On February 13, 2014, state agency psychologist Dr. Lionel

Hudspeth, Psy.D., prepared a Psychiatric Review Technique.  R. 111-12.

Dr. Hudspeth stated that Gaylord had medically determinable mental

impairments that did not "precisely satisfy the diagnostic criteria for both anxiety-related disorders and affective disorders.  Dr. Hudspeth opined that Gaylord had mild difficulties maintaining concentration, persistence or pace, but no restrictions on daily activities of life and difficulties in either social functioning.  Dr. Hudspeth found one or two episodes of decompensation, each of extended duration. R. 111.  Dr. Hudspeth noted, "It is reasonable for this claimant to experience some depressive and anxiety symptoms, secondary to physical issues / financial issues and current life circumstances. This is a Non Severe Mental Impairment."  R. 112.

On February 19, 2014, state agency physician Dr. Reynaldo Gotanco, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 113-16.  Dr. Gotanco opined that Gaylord could: occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, kneel, and crouch; and occasionally stoop and crawl.  Dr. Gotanco opined that Gaylord was limited in reaching with her left arm in front, laterally, and overhead.  Dr.

Gotanco said Gaylord should avoid concentrated exposure to hazards such as machinery or heights.  R. 113-15.

On March 24, 2014, Gaylord completed a Disability Report – Appeal—form.  R. 401-06. Gaylord stated that her conditions had gradually become more severe and caused greater limitations.  R. 401.  Gaylord said, "Virtually every aspect of my day and everything I do is more difficult as a result of the conditions that I suffer from and the symptoms that they cause me."  R. 404.

On August 11, 2014, Gaylord completed a Function Report—Adult form.  R. 410-17.  Gaylord said,

> Arthritis in spine, hips, knees keeps me from standing or sitting for any period of time.  Anxiety—Can't concentrate, don't remember.  Tendonitis—in both shoulder and they hurt all the time.  Depression make me sleep A LOT.  Migraine headaches keeps myself in bed for up to 4 days.  Hand tremors.

R. 410.

Gaylord said that in a typical day she would "wander around the house and yard.  Lay on the couch and sleep some more."  R. 411.  She said she took trazadone to help her sleep.  Gaylord had no problem taking care of herself.  She needed reminder notes to take her medicine.  She prepared her own meals.  She did her own laundry.  Laundry took all day.  She mowed her own grass.  Mowing took an hour.  R. 412.

Gaylord said she sometimes left the house.  She said she rode in a car when she went out.  She drove and sometimes went out alone.  She went grocery shopping weekly, but someone went with her to help.  She engaged in sewing, but not often.  She said that her activities had not changed since her impairments began.  She talked to other people over the phone on a weekly basis.  R. 414.

Gaylord said she could lift five to 10 pounds.  She said she had difficulty squatting, bending, standing, and kneeling because of arthritis, and she had difficulty reaching because of her shoulders.  She said she had problems with concentration, memory, understanding tasks, and following instructions.  Gaylord said she could walk "A ways.  Not sure how far."  She had to rest five to 10 minutes after walking.  She said she could sometimes pay attention five to 10 minutes, and other times she could pay attention for 30 minutes.  She could follow written instructions, but not spoken instructions.  She said she got along with authority figures "very well."  She said she could handle changes in routine, but not stress.  She said she was afraid of crowds.  R. 416.

On August 11, 2014, Gaylord's daughter Sarah Gunder prepared a Function Report—Adult—Third Party form.  R. 425-32.  Gunder said that Gaylord had problems standing because of pain in her back and shoulders.

Gunder said Gaylord's migraine headaches caused her to stay in bed for hours.  She said Gaylord had unpredictable mood swings because of depression and anxiety.  R. 425.  Gunder said that Gaylord sat most of the day on good days and stayed in bed on bad days.  Gunder said Gaylord had no problems taking care of herself and dressing herself.  R. 426.  Gunder said that Gaylord had to be reminded sometimes to take her medication.  R. 427.

Gunder stated that Gaylord prepared her own simple meals, did her own laundry, and did some yardwork.  Gunder said Gaylord needed several breaks when she did yardwork.  R. 427-28.  Gunder said Gaylord went outside only to shop for groceries or go to the doctor.  Gunder said that Gaylord drove herself and went out alone.  Gunder said that Gaylord shopped once or twice a week.  R. 428.  Gunder said that Gaylord rarely sewed when her pain, anxiety, and depression was tolerable.  R. 429.

Gunder said that she brought her children to Gaylord's home weekly.  Gunder said that Gaylord very seldom went out socially.  She said that Gaylord went to an occasional birthday party.  R. 429.

Gunder opined that Gaylord could walk 25 feet on average, but then needed to rest five to 10 minutes.  Gunder stated that Gaylord's ability to pay attention depended on her depression and anxiety symptoms.  She

said Gaylord finished what she started most of the time, Gaylord could follow written or spoken instructions most of the time, and Gaylord got along with authority figures well.  Gunder said that Gaylord could not handle stress or changes in routine.  She said Gaylord got upset over little things.  She said Gaylord believed people were against her.  R. 430-31.

Gunder said that she could not leave her children with Gaylord because Gunder did not know when Gaylord's mood would change. Gunder said Gaylord could not work because of the pain in her back and shoulders and because of her anxiety and depression.  R. 432.

On September 5, 2014, Gaylord went to the emergency room at Fulton County, Ohio, Health Center with left shoulder pain.  R. 572-75. Gaylord had tenderness at the left acromioclavicular (AC) joint at the biceps insertion.  She had limited range of motion in the left shoulder.  An MRI of the shoulder was normal.  R. 573-74.  Gaylord was diagnosed with tendonitis of the left shoulder and discharged with a prescription of tramadol (Ultram).  R. 574.

On October 21, 2014, Gaylord saw Dr. Sharleen Suico, M.D., at the University of Toledo Medical Center, Physical Medicine and Rehabilitation Department, with complaints of shoulder pain.  R. 597-600.  Gaylord said she had pain in her left shoulder for years.  She said her right shoulder had

now started to hurt.  She said the pain was worse with overhead activities.

The pain was 0 out of 10 on the right and 5 out of 10 on the left.  On

examination, Gaylord had AC joint tenderness, subacromial tenderness,

and bicipital groove tenderness in both shoulders.  Gaylord had normal

range of motion in her right shoulder, and limited, painful range of motion in

her left.  Dr. Suico assessed chronic shoulder pain and chronic rotator cuff

impingement syndrome, both not controlled.  R. 599.  Dr. Suico

administered steroid injections in the left shoulder, and prescribed a course

of physical therapy.  R. 600.  Gaylord had physical therapy sessions from

October to December 2014.  R. 583-85.

On December 30, 2014, state agency psychologist Dr. Joseph Mehr,

Ph.D., prepared a Psychiatric Review Technique and Mental Residual

Functional Capacity Assessment.  R. 127-29, 133-35, 201-03, 207-09.  Dr.

Mehr found that Gaylord had affective disorders (depression) and anxiety

related disorders.  Dr. Mehr opined that Gaylord had moderate restrictions

on activities of daily living, moderate difficulties maintaining concentration,

persistence or pace, mild difficulties maintaining social functioning, and one

or two episodes of decompensation of extended duration.  R. 202.  Dr.

Mehr opined that Gaylord was not limited in carrying out short, simple

directions; and moderately limited in carrying out detailed instructions;

moderately limited in maintaining attention and concentration for extended periods; moderately limited in completing a normal workweek and workday without interruptions from symptoms of her mental impairments; moderately limited in her ability to deal with the public; and moderately limited in her ability to respond appropriately to changes in work settings.  R. 207-08.  Dr. Mehr opined that Gaylord could remember work locations and general procedures, and could understand and remember instructions for simple work of a routine and repetitive type.  He also opined that she retained sufficient attention and concentration to complete a normal workday and workweek on a regular basis.  Dr. Mehr opined that she could get along with supervisors and peers at work.   R. 208-09.

On January 1, 2015, state agency physician Dr. Sumanta Mitra, M.D., prepared a Physical Residual Functional Capacity Assessment for Gaylord. R. 130-32.  Dr. Mitra opined that Gaylord could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ropes, ladders, or scaffolds; frequently balance, kneel, and crouch; and occasionally stoop and crawl.  R. 130-31.  Dr. Mitra also opined that Gaylord was limited in reaching with her left arm in front,

laterally, and overhead.  Dr. Mitra opined that Gaylord should avoid concentrated exposure to extreme cold and hazards.  R. 131-32.

On January 2, 2015, Gaylord saw Dr. Suico for a follow up examination of her shoulder.  Gaylord reported not much improvement with the physical therapy.  On examination, Gaylord had AC joint tenderness, subacromial tenderness, and bicipital groove tenderness in both shoulders. Gaylord had normal range of motion in her right shoulder, and limited, painful range of motion in her left.  Dr. Suico stated that a November 2014 MRI of Gaylord's left shoulder showed tendinosis of the supraspinatus muscle and mild AC joint arthritis.  R. 594.  Dr. Suico administered a steroid injection into Gaylord's left shoulder.  R. 595.

On March 13, 2015, state agency physician Dr. Mark Hinzman, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 204-06. Dr. Hinzman opined that Gaylord was limited to occasionally lifting 20 pounds and frequently lifting 10 pounds; standing and/or walking six hours in an eight-hour workday; sitting six hours in an eight-hour workday; occasionally climbing ramps and stairs; never climbing ropes, ladders, or scaffolds; frequently balancing, kneeling, and crouching; and occasionally stooping and crawling.  R. 204-05.  Dr. Hinzman also opined that Gaylord was limited in reaching with her left arm toward her front, laterally, and

overhead. Dr. Hinzman opined that Gaylord should avoid concentrated exposure to extreme cold and hazards. R. 206.

On April 18, 2015, Gaylord went to the Illini Community Hospital with blurred vision. R. 608-09. Gaylord was on medications for high blood pressure and depression. Gaylord stated that she also smoked marijuana daily and used "a liberal amount of alcohol." R. 608. On examination, Gaylord moved all extremities without difficulty, she had normal strength in all extremities, and she had a normal gait. Gaylord's speech was slurred which emergency staff determined "may be associated with her alcohol use or her six different psych medications she is on at this time." A CT scan of her head showed no acute abnormality and mild signs of chronic small vessel disease. R. 642. Gaylord was discharged with a diagnosis of atypical migraine and elevated glucose. R. 608. An MRI taken on April 24, 2015, showed no active ischemic process. R. 644.

On July 27, 2015, Gaylord was admitted to Blessing Hospital for depression and an overdose of four trazadone tablets and 8-10 propranolol tablets. Gaylord stated that she was living with her fiancé, but the two of them were breaking up. Her fiancé's two grandchildren were also in the home, causing additional stress. On admission, Gaylord, "endorses a sad and depressed mood, feelings of hopelessness, helplessness,

worthlessness, irrational feelings of guilt, decreased feeling of enjoyment or pleasure in life, anhedonia, lack of energy, withdrawn, isolated." Gaylord had suicidal ideas with plans to overdose. R. 694. On admission, she was diagnosed with major depressive disorder, severe, recurrent, without psychotic features; and borderline personality disorder traits. She was assigned a GAF score of 30. R. 695-96.

Gaylord was discharged from Blessing Hospital on August 4, 2015. She was improved and stable. She denied any suicidal or homicidal ideations. Her discharge diagnosis was major depressive disorder, severe, recurrent, without psychotic features; borderline personality disorder; status post overdose on trazadone and propranolol. She was assigned a GAF score of greater than 50. R. 700.

On October 2, 2015, Gaylord had an MRI of her cervical spine taken. The MRI showed mild disc bulges at C4-C5 and C6-C7 and status post spinal fusion at C5-C6. R. 648.

<u>THE EVIDENTIARY HEARING</u>

On May 12, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 43-82. Gaylord appeared in person and with her attorney representative Bradley Hobbs from an organization called Citizens Disability, LLC, authorized to represent claimants in disability proceedings.

R. 45. See R. 323-324.  Vocational expert Amy Kutschbach also appeared
by telephone.  R. 45.  The ALJ asked Hobbs if he expected to present any
additional evidence.  Hobbs provided the ALJ with two additional medical
records, R. 728-35, that Gaylord gave him before the hearing.  Hobbs
provided them to the ALJ and agreed to file them electronically.  R. 46.
Hobbs had no objections to anything in the record.  R. 47.

Gaylord then testified.   She was widowed and engaged to be
married.  She lived in a one-story house with her fiancé. She had one
daughter aged 35 years.  She had three grandchildren aged 5, 13, and 17
years.  Gaylord said she had a driver's license and drove about once a
week.  Her fiancé usually drove. Gaylord could read and write, but had
problems concentrating while reading.  R. 47-52.

Gaylord last worked as a cashier at a gas station/convenience store.
R. 53.  She said she stopped working because of anxiety.  She testified she
went into a mental hospital in February 2013. R. 56-57.  Gaylord indicated
she had been hospitalized for mental conditions three times, February and
April 2013, and July 2015.  R. 58.

Gaylord stated she also could not work because of migraines, back
pain due to arthritis in her spine, her hips, and her shoulders.  She also
said she had hand tremors, and she had tremors all of her life.  R. 59.

Gaylord said she had migraines at least once a month.  The migraines lasted five to seven days.  R. 61.  She testified stress caused the migraines.  R. 65.

Gaylord also testified that she smoked marijuana nightly.  She said it relaxed her back.  R. 71.

Gaylord stated that she usually watched her grandchildren every weekend.  The grandchildren stayed overnight every weekend.  R. 66.  She said that some of her fiancé's grandchildren also stayed with them every weekend.  Four or more of their grandchildren stayed every weekend. R. 66-67.

Gaylord said she could take care of her personal hygiene and could dress herself.  Gaylord did her own laundry.  R. 60.  She testified that her fiancé did most of the cooking in the house.  She fixed small things like grilled cheese sandwiches for the grandchildren.  R. 67.  She did some lawn mowing, but her fiancé did most of the mowing. R. 68.  She said that she shopped for groceries with her fiancé.  She felt too much anxiety shopping alone.

Gaylord had traveled from Pittsfield, Illinois, to Toledo, Ohio three times in the last six to eight months to visit her ailing mother.  R. 68.  She stated that she saw relatives on holidays.  She said that she saw one friend

occasionally.  The last time she visited with family was at her daughter's house for a holiday.  She stayed a couple of hours.  She said that about 40 people were there.  R. 70.  Gaylord and her fiancé also went to their grandchildren's school ball games.  R. 76.

Gaylord said that she could stand for five to 10 minutes before her back hurt so much that she would have to sit down and take pain medicine.  She indicated that she could sit for a couple of hours at a time.  She testified that she had trouble finding her balance when she stood up after sitting.  Gaylord said she could raise her arms as long as she was not carrying anything heavy.  Her shoulders and hips hurt after she sat for an extended period.  R. 72-73.

Gaylord said that she used a computer tablet to play games for about an hour a day.  She also used the tablet to see her Facebook page and to shop.  R. 75.

Vocational expert Kutschbach then testified.  Hobbs stipulated to her qualifications as a vocational expert before she testified.  R. 77.  The ALJ asked Kutschbach the following hypothetical question:

> Please assume an individual with the claimant's age, education
> and experience, has the residual functional capacity for light
> work, can occasionally climb ramps and stairs, never climb
> ladders, ropes and scaffolds, occasionally balance, stoop,
> kneel, crouch and crawl, occasionally reach, occasionally reach
> overhead with both upper extremities, avoid concentrated

> exposure to hazards, no commercial driving, understand, remember and carry out simple instructions, perform simple, routine and repetitive tasks but not at a production rate pace. Adapt to routine changes in the work place that are infrequent and easily explained, interact occasionally with supervisors and coworkers and never with the general public. Would the individual be able to perform any of her past work?

R. 78.  Kutschbach said that such a person could not perform Gaylord's prior work.  Kutschbach opined that such a person could perform other jobs such as a repack room worker, with approximately 320,000 such jobs available nationally; office helper, with 50,000 such jobs available nationally; garment folder, with nearly 100,000 such jobs available nationally; sorter, with approximately 8,000 such jobs available nationally; assembler, with approximately 10,000 such jobs available nationally; and final assembler, with approximately 5,000 such jobs available nationally . R. 78-79.

Kutschbach opined that such person could not work if she was off-task 20 percent of the workday.  Kutschbach stated that a person could not be regularly absent from work for one to two days per month every month and stay employed.  R. 80.

Hobbs had no questions for Kutschbach.  R. 81.  The hearing concluded.

## POST HEARING FILING

On June 1, 2016, Gaylord's representatives submitted documents with attachments entitled, Post-Hearing Memorandum of Law & Objections to the Vocational Witness' Testimony.  R. 453-77 (Post-Hearing Memo). Gaylord's representatives made seven objections to Kutschbach's testimony:

I.    ***We Object:*** to any purported expert testimony from Ms. Kutschbach regarding job incidence in the local, regional or national economy as the record in this matter on its face fails to show any qualifications through training, education or experience that would establish the necessary expertise to give opinions on the number of jobs that exist in the local, regional or national economy.

II.    ***We object:***  to the vocational witness' testimony regarding job incidence in that said testimony is unfounded, unsupported, unreliable and conjured from whole cloth. . . . .

III.    ***We object:*** to the vocational witness offering sample DOT titles with job numbers representing larger occupational groups, as the vocational witness' ambiguous and vague testimony precludes the claimant from assessing how many, if any, actual positions exist in the national economy for the DOT titles offered by the vocational witness at Step 5 of the Sequential Analysis. . . . .

IV.    ***We object:***  to the positions offered by the vocational witness in response to the hypothetical residual functional capacity assessment, as this opinion is not reliable and is not supported by substantial evidence because current labor market research and reliable sources of job information dictate

that these positions would require more than occasional
interaction with coworkers and supervisors.
. . . .

V.      ***We object:*** to the vocational witness' testimony as the
jobs offered at hearing are no longer performed at the unskilled
level pursuant to current labor market data:
. . . .

VI.     ***We object:*** to the vocational testimony that the jobs Ms.
Kutschbach identified could be performed within the
hypothetical residual functional capacity assessment.
. . . .

VII.    ***We object:*** to an unfavorable decision being issued in the
instant matter prior to affording the claimant the opportunity to
address the aforementioned evidentiary and vocational
inconsistencies at a supplemental hearing.

R. 453-77 (emphasis in the original) (internal citations omitted).  The term

DOT referred to the Department of Labor's Dictionary of Occupational

Titles.  The objections challenged Kutschbach's qualifications, as well as

her methodologies, including her use and reliance on the DOT.  The

objections asserted that the DOT was obsolete and could not provide a

reliable basis to establish the necessary evidence at Step 5 of the Analysis

that a person could perform a significant number of jobs in the national

economy.

The Post-Hearing Memo included several attachments to support the

objections.  One set of supporting documents was an opinion by a person

identified as Paula F. Santagati, along with Santagati's resume.  R. 475-77.

Santagati's resume stated that she was a senior vocational rehabilitation counselor for the Massachusetts Rehabilitation Commission in Lawrence, Massachusetts. Santagati opined that a person who could interact only occasionally with coworkers and supervisors could not work because she could not maintain the level of contact with supervisors and coworkers that would be necessary to learn any position. R. 475-76.

## THE DECISION OF THE ALJ

The ALJ issued her opinion on August 4, 2016. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Gaylord met her burden at Steps 1 and 2. She had not worked since February 15, 2013 and she suffered from the severe impairments major dysfunction of a joint left shoulder; degenerative disc disease of the lumbar and thoracic spine; affective disorder; major depressive disorder; and borderline personality disorder.  R. 20.  The ALJ

determined at Step 3 that Gaylord's impairments or combination of

impairments did not meet or equal any Listing.  R. 20-23.

At Step 4, the ALJ found that Gaylord had the following RFC:

After careful consideration of the entire record, I find that the
claimant has the residual functional capacity to perform light
work as defined in 20 CFR 404.1567(b) and 416.967(b) except,
with the following functional limitations: the claimant can
occasionally climb ramps and stairs; never climb ladders,
ropes, or scaffolds; frequently balance and kneel; occasionally
stoop, crouch, and crawl; occasionally reach overhead
bilaterally; and should avoid concentrated exposure to hazards;
the claimant should not engage in commercial driving. With
respect to the claimant's mental functioning, she can
understand, remember, and carry out simple instructions;
perform simple, routine, and repetitive tasks, but not at a
production rate pace, such as an assembly line; adapt to
routine changes in the workplace that are infrequent and easily
explained; and interact occasionally with supervisors and
coworkers, and never with the general public.

R. 24.  The ALJ relied on the opinions of Drs. Gotanco, Mitra, Hinzman,

Hudspeth, and Mehr; the medical examination records that showed normal

strength, and normal range of motion except for the left shoulder; the MRI,

CT scans, and x-rays that showed relatively mild degenerative changes

and mild problems with her left shoulder; and Gaylord's GAF scores that

exceeded 50 after she completed her inpatient psychiatric stays.  R. 25-30.

The ALJ recited consultative examining physician Dr. Kozma's major

findings, including the statement that Gaylord "could only stand for 5-10

minutes before experiencing discomfort in her feet."  The ALJ stated Dr.

Kozma did not offer a function-by-function analysis or opinion regarding Gaylord's functional capacity.  The ALJ stated that he "provided for functional limitations reasonably related to the impairments identified" by Dr. Kozma.  R. 30.

The ALJ gave little weight  to consultative examining psychologist Stelling.  The ALJ noted that Stelling's opinions were not entitled to controlling weight because he was not a treating source.  Further, Stelling based his opinion on one interview and did not conduct any objective psychological testing.  Lastly, the ALJ stated that Stelling's opinions "were somewhat inconsistent with the treatment notes from the Illini Community Hospital testing or findings, which shows that the claimant has a history of positive responses to psychotropic medications and supportive counseling services when she is compliant with treatment."  R. 31.

Based on Gaylord's RFC, the ALJ determined that she could not return to her prior work.  R. 34.  The ALJ determined at Step 5 that Gaylord could perform other jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 and vocational expert Kutschbach's opinions that a person with Gaylord's age, education, experience, and RFC could perform

representative jobs of repack room worker, office helper, and garment

folder.  R. 34-35.

The ALJ addressed the Post-Hearing Memo and attachments as

follows:

> The claimant's representative has submitted a post-hearing
> brief objecting to the statistical sources upon which the
> vocational expert relied upon in forming her opinion regarding
> the number of jobs available in the national economy.
> However, the claimant's representative was present at the
> hearing, stipulated to the qualifications of the vocational expert,
> and had the opportunity to cross-examine the witness while she
> was under oath.  Additionally, the claimant's representative was
> provided with an opportunity to supply his own witness, or
> vocational expert, to challenge the evidence offered by Ms.
> Kutschbach, but failed to do so.  Pursuant to 20 CPR
> 404.15.1560(b)(2), 404.1566(d), 416.960(b)(2), and
> 416.966(d)), a sufficient basis for vocational expert testimony
> can be found based upon the vocational expert's professional
> knowledge and experience, as well as reliance on job
> information available from various governmental and other
> publications.  Therefore, because the claimant's representative
> was present at the hearing, stipulated to vocational expert's
> qualifications, had the opportunity to cross-examine the
> witness, and was afforded the opportunity to call his own
> witness in contra to the testimony offered by the vocational
> expert, I find the objections not well taken and deny the same.

R. 35.  The ALJ concluded that Gaylord was not disabled.

Gaylord appealed the ALJ's decision.  On July 28, 2017, the Appeals

Council denied Gaylord's request for review.  The decision of the ALJ then

became the final decision of the Commissioner.  R. 1.  Gaylord then filed

this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant material evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ need not mention every piece of evidence, by must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ failed to explain adequately his treatment of the opinions of Dr. Kozma and psychologist Stelling.  Dr. Kozma made a specific functional assessment that Gaylord could only stand for five to 10 minutes without experiencing pain in her feet.  The ALJ stated that he included in the RFC "functional limitations reasonably related to the impairments identified" by Dr. Kozma.  R. 30.  The ALJ did not explain how Dr. Kozma's finding that Gaylord was unable to stand for more than five to 10 minutes because she experienced pain in her feet was reasonably related to his determination that she could perform a limited range of light work.  Light work includes, among other physical activities, "a good deal of walking or standing . . . .  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities."  20 C.F.R. § 404.1567(b).   The ALJ did not include in Gaylord's RFC any restrictions on the normal amount of standing associated with light work.  The ALJ, thus, failed to explain adequately how Dr. Kozma's finding that Gaylord was unable to stand for more than five to 10 minutes was reasonably related to an ability to perform light work.

The ALJ also did not adequately explain the basis for his conclusion to give psychologist Stelling's opinions little weight.  Specifically, the ALJ stated that Stelling's opinions were inconsistent with the records from Illini

Community Hospital that showed "that the claimant has a history of positive responses to psychotropic medications and supportive counseling services when she is compliant with treatment." R. 31. After careful review, the Court has been unable to locate in the ALJ's decision any reference to records from the Illini Community Hospital that discussed Gaylord's response to psychotropic medicine or supportive counseling services, or the effect of such treatment and services when Gaylord has been compliant. See generally, R. 25-30 (ALJ's review of the medical evidence). Furthermore, the ALJ did not address the consistency or inconsistency between his opinions and the treatment records from Blessing Hospital where Gaylord was treated as an inpatient three times for very serious depressive episodes, which included two attempted suicides. The ALJ failed to address Stelling's opinions in light of the rest of the evidence in the record. The errors in treatment of the opinions of Dr. Kozma and psychologist Stelling require reversal of this case.

Gaylord also argues that the ALJ erred in failing to respond adequately to the objections in the Post-Hearing Memo and the supporting attachments, including the opinion of Santagati. The ALJ responded essentially that the Post-Hearing Memo was too little too late because Gaylord had the opportunity to present the evidence at the hearing and

failed to do so.  Rather, Gaylord's representative stipulated to Kutschbach's qualifications as an expert witness and did not ask Kutschbach any questions.  The ALJ's response is consistent with controlling authority in this Circuit.  A Social Security disability claimant that wishes to challenge a vocational expert's qualifications or opinions must do so at the hearing. See Brown v. Colvin, 845 F.3d 247, 250, 254 (7th Cir. 2016); Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009); Ragsdale v. Shalala, 53 F.3d 816, 819 (7th Cir. 1995).  This Court must follow controlling precedent.  The ALJ did not err in his handling of Gaylord's Post-Hearing Memo.

Gaylord argues, without citation to authority, that requiring her to present evidence at the hearing violates due process because she did not know what evidence the Commissioner would present to meet the burden at Step 5.  The Court sees no violation of due process.  The essence of due process is notice and opportunity to be heard.  Matthews v. Eldridge, 424 U.S. 319, 333 (1976).  Gaylord received ample notice and opportunity to be heard.  As is evident from the Plaintiff's Post-Hearing Memo, Gaylord was represented by experienced social security disability representatives. R. 453-477.  They had represented the Plaintiff since June 7, 2013.  R. 241.  As such, those representatives knew that Drs. Gotanco, Mitra, Hinzman, Hudspeth, and Mehr found that Gaylord had non-exertional

limitations which would require evidence at Step 5 beyond the Medical-Vocational Guidelines, including testimony from a vocational expert.  See SSR 83-12; SSR 83-14; SSR 85-15.  Gaylord's representatives also knew that the Social Security Administration took notice that the DOT was a source of reliable job information.  See 20 C.F.R. § 404.966(d).  Gaylord's representative knew that a vocational expert would be required to resolve any conflicts between her testimony and the DOT.  SSR 00-4p.  Gaylord's representatives, therefore, knew before the hearing that all the issues raised in the Post-Hearing Memo would be at issue at the hearing.  Those representatives could have, and should have, presented the evidence and argument at the hearing.  There was no surprise or denial of the opportunity to present the evidence and argument.  Gaylord's representative, rather, decided to stipulate to the expert's qualifications and neither asked any questions, nor challenged her opinions at the hearing.  Gaylord had ample due process.  The treatment of the Post-Hearing Memo was not error.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Jan Kay Gaylord's Motion for Summary Judgment (d/e 10) should be ALLOWED; The Defendant Commissioner's Motion for Summary Affirmance (d/e 15) should be DENIED, and this matter should be REVERSED and

REMANDED for further proceedings before the Commissioner under 42 U.S.C. § 405(g) sentence four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:  November 5, 2018

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE